We have five cases to be submitted today on oral argument, and depending on how the cases move along, we'll take one or more breaks during the morning before completing the docket. And we begin with United States v. Bennett. Mr. Crosby. Good morning, and I have to say it's quite an honor for me to appear before you, and it's also an honor for me to represent Ms. Sherrie Bennett, who I'm proud to be able to be in a position to help explain what happened. My client was convicted by a jury, but she was not convicted as charged in the indictment. And although there were plenty of witnesses who testified in the case and plenty of boxes of evidence, the evidence was not overwhelming with respect to guilt. There's no question about those facts, but it's my prayer that I will be able to help this court understand what happened. In a brief nutshell regarding the facts of the case, my client was a nurse and a close friend of a man, a doctor named Dr. Limes. He was a board-certified doctor in many different fields, a well-respected doctor in our community, and he opened up a facility where he used a radiation machine to treat cancer. And he received referrals from many physicians in the community. And Sherrie Bennett became his office manager eventually, but in the beginning, his finances were handled by a man named Dahlhauser. And towards the end of this, the last three years, that's where we're at issue in this case as to what happened and whether or not Dr. Limes' confidence became an issue. Towards the end, like all of us, there are some points where we all at some point will begin to have age will catch up with us. But at all relevant times here, Dr. Limes was a duly licensed physician in the state of Mississippi. And he had many business affairs going on, and he conducted his own business. And I know that with respect to the issue of whether Dr. Limes was competent, that we do have witnesses on both sides, and that is a jury issue as to whether or not he was competent. But I mention it to you only to the extent that the question regarding whether the evidence was overwhelming or substantial might affect the various considerations that we have. Because sometimes error can be overlooked if the evidence is substantial. I believe that it's the only thing that could possibly help the government in its argument, but I submit to you that the evidence was not overwhelming and was not sufficient to overcome these errors. The most blatant error and the biggest error I submit to you is with respect to the jury instructions. My client was convicted not for the criminal law violations, but she was convicted based on regulations and guidelines, guidelines from the medical board that tell a doctor that before he can issue a prescription for a Schedule II pain pill. Doesn't this go beyond the question of whether the doctor followed all the rules about giving somebody an examination before you prescribe? And the allegation is that she was actually signing off for the doctor? Well, it is true that that was sort of an issue, that they presented evidence that perhaps Sherry Bennett would assist the doctor and that his instructions would help fill out prescriptions. Well, that's your view of the facts, but the government's view of the facts is that she was pretty much just had his prescription pad and was using his stamp and writing over it and all of that, and so I'm not taking a side on that. That's for the jury, but that's the point. That's for the jury. So the fact that if the case was solely that the doctor prescribed something to her and hadn't done a physical exam and that were the only facts in the case, I think your argument would have a lot more force than the actual facts in this case, which are a little broader than that. Well, here's the problem with that. Yes, they presented such evidence that that may have happened, but when you look at the jury instructions, the jury had no real guidance as to what that meant. The only guidance they got was to the effect that the attorneys would argue what it means to say these two key phrases. One, if there was a legitimate medical purpose, and two, was the medicine prescribed outside the ordinary course of the medical profession. Those two things. And in the closing argument, Mr. Minardi or the government admitted. He said, ladies and gentlemen, we're not questioning that there was a legitimate medical need, and so actually to that extent I would submit that a directed verdict should have been granted and that was a material element in the jury instructions that he had to prove, that the government had to prove that there was not a legitimate medical need, which he agreed. He said, we don't even contest that. He said there probably was a legitimate medical need. But with respect to the issue, what does it mean outside the ordinary course of practice? Well, they threw out all this evidence that maybe Ms. Bennett helped them fill out the prescriptions and as to whether or not Dr. Lyons may or may not have been incompetent, but that's all the guidance they had. What it came down to was specifically what came out of the government prosecutor's mouth was if they did not do the things necessary to get to the point, that's why we don't have to worry about whether it was a legitimate medical need. If they didn't conduct a physical exam, a nation, and did not report that in the file, or if they called in prescriptions instead of writing them, these guideline violations equal the violation of the criminal law, and that's what it came down to. But I thought that in the closing argument the government argued we have to show more than that Dr. Lyons messed up because this is all on Dr. Lyons. If Dr. Lyons is competent and he's messing up on these prescriptions, he's not doing the exam, if I'm a patient of a doctor who doesn't do what he's supposed to do before he writes me a prescription, I'm not responsible for that. The doctor's responsible for that. And the government admits that. So they had to tie Sherry into that, and I use her first name only because there's Sherry and Jerry and whatever and different Bennetts, but Mrs. Bennett. They only tied her into it by she's overcoming him because he's incompetent. So how does that factor into all of this? So if the medical stuff is getting messed up, but it's because Mrs. Bennett, Mrs. Sherry Bennett, is basically taking over Dr. Lyons because he's incompetent, how does that affect your argument? That may have been a consideration of the jury, and I believe that that's important to the government's case. But when you look at the jury instructions, it never said that. It never said that you'll have to find that Dr. Lyons was incompetent or that he was overpowered by the will of Sherry Bennett for her benefit. The government argued that. I mean, the government said, okay, we've shown Dr. Lyons is messed up. That's not, I don't remember the words they used exactly, but we've shown Dr. Lyons is in violation, but that doesn't help us, the government, here because we didn't prosecute him. We're prosecuting Sherry Bennett and Jerry Bennett. So then they take that step. This is a case about the incompetence of Dr. Lyons. They said that. So why wouldn't that be, I mean, how could you say it was harmful or not harmless error if that's all that was argued to the jury? They weren't arguing that there was some technical rules violation that Sherry should have known, and therefore she is liable for that. Absolutely the government would agree that the key issue was the competence of Dr. Lyons, whether or not he was competent or not, they specifically called it the key issue. And granted, they did argue that Sherry Bennett overpowered Dr. Lyons. That was their argument. However, even though they did throw that out there, when it came down to it, you have your instructions, and your instructions give these vague statements about outside the ordinary course of medical practice and whether there was a legitimate medical need, and he said you don't have to worry yourself with a legitimate medical need, and he dropped the argument. I mean, although he mentioned it, that his competence was the key issue, he did mention that and did say that, but yet he argued that the way that the verdict comes down is, ladies and gentlemen, either they followed these guidelines or they didn't. And if they didn't follow the guidelines but maintained a chart, that's all you need to know. So granted, the jury may have gone off on that issue or may have properly considered that the real issue should be whether she overpowered him, but without a jury instruction telling you that that is the issue, that you have to make that finding? If the jury instruction wasn't specific enough but your jury instruction was wrong because it added the word corruptly, and this is assuming you preserved it. I don't want to get in that whole mess. Then what's the answer there? I mean, in other words, if you didn't submit the right charge and the charge that was submitted was too vague, isn't that still a problem for you because don't you have the duty to submit a correct charge that doesn't add an element of corruptly that isn't in the statute? Well, we do. And to a certain extent, we have to get into the issue of whether it was preserved. But in my email, on page 38 of my brief, which we quoted the exact email, we were telling the judge, you know, judge, in this trial, it became apparent and a concern that the jury is going to confuse these regulations with the law and we need to clear up that issue. And I gave him an example of what we did in the judicial bribery case with Judge Wingate out of Jackson back from 2005. And we used it. And even though the word corruptly didn't have to be in there, but that wasn't the point. The point was we have to tell the jury that it takes more than a violation of the guidelines for which she was not even indicted. While the guidelines absolutely would be an important consideration. I wouldn't even question that. Just like the case of Brown says, you can put those guidelines in there because it helps frame where you're going. It helps show the state of mind of the defendant. But we're telling the judge specifically, judge, we've got to do something about this problem. The judge actually cut me off to the extent during the trial I'm trying to demonstrate to the government's witness that there's a distinction between administrative violations and the violations of a criminal law with criminal intent. And so we told the judge that, but he left us with what we have, what you see there. That's all we have. So we really never even got to the point of where the word corrupt could be there. We couldn't even define the difference between regulations and guidelines in the law. So while we do have a duty to give him correct instructions, the judge made it clear we weren't going to get there. The instructions stated as they were was all there was going to be. So I'm really glad that you bring those up because it shows that there's many different ways that the jury could have gone down on their page 38 for the instruction. But there's many different ways that they could have commuted. But definitely the instructions did not give us that. And if it's okay, I'll move before I run out of time to my Fifth Amendment argument. Do you have more questions? Okay, with respect to the issue of whether the Fifth Amendment right, where the government put on in their case in chief a witness, a seasoned witness, from the Attorney General's Office who testified that he had been out to Dr. Lyons' house, that he was contacted by the Mississippi Bureau of Narcotics, the DEA, and the Medical Licenses Board on the three key issues that we have here, the three key entities for why we were on trial. And he was contacted by them, and he went out to go investigate the criminal part of Dr. Lyons' condition, whereas the DHS were going to investigate the social aspect. Two people went out, but he was investigating the criminal part. And then after they had taken Dr. Lyons to the hospital, this is after he had already been discharged from the clinic, that he goes over to the house, and my client's husband of over 40 years allegedly tells this witness that he puts on his case in chief, we have nothing to say to you, we have an attorney, we're not going to talk to you, and made it clear it was we and them. It was plural. He was speaking for both of them. Now, that was a violation of a fundamental constitutional right that no defendant has a duty and is required to have to make statements. There's only one reason they put that on, and that's because it is a common belief that despite our cherished and beloved fundamental constitutional rights that if people won't talk to the police when they're being investigated, well, they must be guilty. And that's why they put that in there. Were they being investigated at that point, or was the doctor being investigated? They were being investigated because he was contacted by the Mississippi Bureau of Narcotics, the DEA, and the Medical License Board about the situation. The investigation was underway. And although he was called out to go look for Dr. Lyons, he's clearly stated in his testimony that he was there for the criminal part of it, whereas Ms. Zoeller was there for the DHS-type conditions, his social welfare. But he was looking at the criminal aspects of it. Now, Judge— Were there objections made to that at the time? I'm sorry? Were there contemporaneous objections made? Absolutely. I made an objection right on the spot. And then the judge, the reason that the judge ruled the way he did, he said that, one, that he was there to investigate the welfare of Dr. Lyons, which actually is not what the witness said. He was there because he was investigating the criminal aspect and because the Mississippi Bureau of Narcotics, DEA, and Medical License Board contacted him. So he made it clear that it was part of this case and why he was testifying. Contemporaneous objection was made. And then the judge said also that my client doesn't have standing to make the objection. But the— Was the objection made in the presence of the jury? What did the judge say, if anything? He said that my client doesn't have standing because it was the husband who said, we have an attorney, we don't want to answer your questions. But it was clear that whenever the—Mr.—Agent Thompson— And that involved the privilege. It was her husband. See, Thompson went to talk to them, plural. And he said that we end our conversation with them, plural. So it was clear from what he was saying that it was both of them there, although the husband was doing the talking. But my objection is not that we're trying to suppress some incriminating statement. My objection is that they're simply putting on, in their case in chief, the testimony that they assert—they had the audacity to assert the constitutional right. And that's why—and that was their testimony. All right, your initial time has expired, but you've saved time for rebuttal. Mr. Crosby, thank you. Mr. Cleveland? Mr. Cleveland? Good morning, Your Honors. Gaines Cleveland for the government. May it please the Court. With me at the counsel table is John Minority, who tried this case. Let me first turn to the jury instruction issue. And let me do pick up with what Judge Haynes talked about. This was not a technical violation of the regulations. We're talking about a situation where the jury had a lot of information about the course of the conduct, and this did not depend on simply a violation. But did the jury know that that distinction was being made? That's the argument he's making, is did the jury understand that if it was just that the wrong form was filled out, that's not good enough to convict her, that you need to show something more, like this business where she's kind of overtaking him and running the show and signing his name, that that's a different thing than just why you didn't fill out the right form or check the right box. Our position, of course, is that the jury was given appropriate instructions for the case, and that there was a reasonably accurate picture of the law, as the Court talks about in the Stanford case, which we cite at page 23. And we set forth sort of the relevant portion of the instructions at page 26. And what the judge told the jury is right in line with what this Court has said in other cases, including the Brown case that Judge Higginbottom sat on that we cite at page 24 of our brief. So we're really talking about what is the exception to Title 21 that allows medical professionals to dispense controlled substances. They have to be authorized by law, and the source of the law is what is the medical profession and what is set forth in the standards of practice. You have somebody who was a long-time nurse for Dr. Lyons, somebody who ran his clinic, knew about the fact that you have to have somebody be a patient of the clinic. But if Dr. Lyons was competent and decided to prescribe these drugs without doing the physical exam, what are we supposed to do? That's not up to the nurse to go, whoa, doctor, you can't do that. The doctor is the one who's in charge and responsible. That's right. So how is the jury, though, advised, other than the closing argument, how is the jury advised by the instructions that this is a case about her overtaking him and taking advantage of his incompetence rather than a case of she's somehow vicariously liable for his breaches of medical duty? Given, of course, the aiding and abetting instructions, there's all of the proof that he was incompetent. It was the defense's position, including in her testimony in her own defense, that he was competent. The jury had plenty of evidence to the contrary that he was incompetent, that she was taking advantage of him, was manipulating the situation for the advantage of her family members, at whom she had pain killers prescribed, that she phoned into pharmacies, that she took the prescription pad, stamped the signature of the doctor, and then wrote over the signature. This was a prescription, a signature pad kept in her desk drawer. We had the course of conduct relating to the bankruptcy as well, where she's writing checks out of the bankruptcy estate. So they have a whole body of evidence that was available to them, and the court appropriately advised the jury as to what the law is in this circuit. So it's our position that it was not talking about merely violating regulations. That certainly was not the sole basis for the conviction here. There were these proposed defense instructions that Judge Haynes, you asked about, and of course they were incorrect as a matter of law in that they were making reference to the offense being done corruptly, as Judge Osler had pointed out at Record 406, or they already included things such as the concept of good faith. There were other instructions that Mr. Crosby mentioned that were drawn from a judicial bribery case but were not at all tailored to these facts. So you've got the judge who's giving an appropriate set of instructions, and he has a reason to reject the defense instructions. Well, I think what Mr. Crosby is saying about the judicial bribery point was just an illustration of the fact that something can be a violation, say, of an ethical rule. If you were to give me a gift, it would be a violation of ethical rule for you to give it to me and me to accept it. That wouldn't necessarily, though, translate into a bribe, even if you ultimately won this case. There would still need to be something more. So even though there would be an ethical violation, that that's not the same thing as a criminal violation. That's the point he was trying to illustrate with that here, that just because you fail to do, say, an exam before prescribing a certain drug, which is a violation of a medical regulation, that doesn't translate to a crime. Well, the instructions that he submitted just were emailed to chambers. This was not give and take between the judge as to shaping the instructions. There was a charge conference, and then they had a session on the record, and nothing was said about this subject. And then, of course, the judge gave the instructions, and nobody objected to the instructions that the judge gave. So that's sort of where the situation was. How did these other instructions come in? I read that they were emailed in. I don't understand. They were emailed to chambers. To whom? To chambers? There's a chambers email address, and I believe it's monitored by the courtroom deputy, and these were emailed to the chambers. And there was no reference in the record other than at the sentencing it came up. And no objection made to the charge it was actually given. That's correct. Now, there was— You know, I'm glad you brought the prosecutor with you, because I'll tell you I'm very, very disturbed by this rebuttal closing argument. Whether it's reversible error is something we'll have to grapple with, but it is wrong, very wrong, to get up and say, I am not here to convict an innocent person. I have never, to my knowledge, convicted an innocent person. A United States attorney doesn't know better than that, than to get up and vouch for his own ability to discern what's innocent and guilty. I mean, that is extremely wrong, extremely wrong. Your point is very well taken. Judge Osreden made those same observations in his post-trial ruling, but Judge Osreden also looked at the rebuttal summation in context, and I do want to mention Mr. Crosby says he never attacked the prosecutor personally, but his co-counsel, his co-defendant's counsel certainly did. Mr. Carlisle said the government's case is fabricated and was brought at the behest of the bankruptcy trustee, who stood to make a lot of money. He said the agents were determined to get a conviction no matter what. That's from Record 2284 and 2288. And, of course, in order to evaluate the rebuttal, it's important to look at the opening salvo, as the Supreme Court said. No, two wrongs don't make a right, and to me the government's attorney is charged with a higher standard of seeing that justice is done and not just let's stoop to the lowest level of adversarial conduct we can find in the books. So I just, I mean, I don't think this is defensible. The only question is, is it reversible? The judge said that the comments were aimed at rebutting the arguments of defense counsel about why the case was brought. Okay, that's fine. Some of these comments are aimed at that, but vouching that I, the great Oz, would never prosecute an innocent person is really out of line, no matter what names you're called. It is out of line. It is, in fact, I think if you looked at some of the comments in the case law and you were to line these up, some of them would be considered textbook examples of what not to say in a rebuttal. And I've counseled with Mr. Minority about this. He knows about Judge Ozerden's comments as well. And I think this was seven pages of the transcript. It's at the tail end of the case, the nine-day trial. I think the passion's got a little carried away, and he needs to find a better way to channel his righteous indignation than to say what he said. Now, I do want to say that there was no objection to any of these comments. So the judge was not able to give, he did not, he was not called upon to give a specific cautionary instruction directed to this. The judge did give general cautionary instructions that what lawyers say is not evidence. He said that repeatedly. He said it at the beginning of the case, at the end of the case in his instructions, and I think that can have a moderating influence. And Judge Ozerden also found that the remarks did not cast a serious doubt on the correctness of the verdict. That's recorded at 435, quoting this court decision in Bowen, which we cite at page 56 of our brief. And this court does give considerable weight to the trial court's assessment. The thing that frustrates me, we've had this come up not a lot, thankfully, but enough, where we have these wrongs committed in closing argument by prosecutors, and we go, well, it's not enough in the totality and all that. But when will it end if we don't start holding U.S. attorneys' offices accountable for the actions of their lawyers? When will this stop? When will we stop having this? Because you didn't tell me that this is a lawyer, this is his first case or something. And so even there, we can't have U.S. attorneys getting up acting like this or assistant U.S. attorneys acting like this. When will that stop but if we were to hold it accountable by saying, well, you've gone too far, we're going to reverse? This court has drawn the line when the rebuttal remarks are deemed by the standard that is set forth that they have made a substantial, cast serious doubt about the correctness of the verdict. That is to say, for example, when you have a rebuttal summation which is directed at a witness who is so key to the case and the government is vouching for that witness and suggesting to the court that the prosecutor has access to what the court talks about as sort of a secret store of information that's not available to the jury. And the prosecutor is calling on that and calling on the jury to respond accordingly. Here we have a wide body of evidence. Counsel, what did the district judge do in response to this argument? He was not objected to, but did the district judge ever speak to the assistant United States attorney about this? The judge gave a lengthy post-trial ruling and the court dissected the rebuttal summation and called the prosecutor to account for where the prosecutor was at. Well, when the local federal judge nails it down, that's far more effective than from here. But I share the same sentiments that my colleague does about the difficulty of this. But it begins and ends with the trial judge. When he says no, and I mean no, it will stop. That's exactly right. Why don't you recount for us, just give us a summary of how it is that you believe the evidence was sufficient, not only on the controlled substance part of the conviction, but also on the bankruptcy fraud. Tell us how it is in your view, whether I agree or disagree, that the evidence is enough to overcome any prejudice from the rebuttal prosecutor. Let me first mention that we think this is what this Court has called a multifaceted case as a Gallardo decision, which we cite at page 61. It certainly did not depend on any single source of proof that was the subject of the rebuttal. Mr. Crosby said that this proof was not overwhelming. Well, Judge Ozerden, I thought, did a really good job of encapsulating the proof, and let me just briefly refer the Court to this at page 424 of the record. The government presented incriminating evidence regarding Dr. Lyons' competency to control both defendants exerted over Dr. Lyons. The records were improperly issued prescriptions for controlled substances and the funds which Ms. Bennett surreptitiously obtained from the clinic's bankruptcy estate through Dr. Lyons. Ms. Bennett testified on her own behalf, and the jury heard and obviously rejected her version of the events related to the controlled substance prescriptions and the bankruptcy estate's property. I thought that was a good summary at 424 of the proof and why the judge considered it to be overwhelming. Go into a little bit more detail just to remind us about the bankruptcy fraud and exactly what happened there. With the doctor's medical decline, they ended up bringing in some other doctors to carry on the practice, but it ended up not being sustainable. The practice went into bankruptcy, and in a very unusual situation, Sherry Bennett was the one who was the office manager and the nurse there. She was basically running the practice. Mr. Cosby said that the doctor ran the practice. Well, you can read the testimony, and it was clear that she was running the practice. The doctor was really not making competent decisions and did not make decisions. So the practice ended up in a bankruptcy. So she had control over the checkbook for the bankruptcy estate and was writing checks to Dr. Lyons and to herself, and then she cashed those. I thought she wrote one check for $10,000 and one for $16,000. These were not tremendous amounts, but they were nevertheless defalcations. The bankruptcy trustee was appointed ultimately to supervise the bankruptcy. Thank you. With respect to the Fifth Amendment issue briefly, the state officials who went to Dr. Lyons' house were there to investigate abuse of an adult, as elder abuse. They were not there to investigate bankruptcy, fraud, or anything related to the narcotics case. So their going to the door had nothing to do with this case. I did notice that everybody looked at this as a question of whether anybody had been under arrest,  and no one had been under arrest. Judge Osgren said, well, Miranda doesn't apply. I did notice that Judge Smith, you wrote the decision in a case called Ashley that made the observation that there's apparently a circuit split and our circuit is not weighed in on whether pre-enlist silence can be a basis for constitutional violation. So the state of law in our circuit is that it is not. But what keeps getting missed in this is that Judge Osgren instructed the jury not to consider that response from the witness. Why go there? Why go there in your interrogation? How did this come in, the evidence? Mr. Crosby said, well, the purpose of this was to try to show a refusal to cooperate on the part of the Bennett's. Well, that's a very thing that you don't want to go there for. But the prosecutor is on the record at page 1133 as saying this was basically a surprise to him. This is sort of a gratuitous comment by the witness. So it really is but for the moment. The judge did instruct the jury to disregard, and the judge repeated that admonition. Was it clear in the courtroom that this was an investigation into elder abuse? Absolutely. And that they didn't want to cooperate with those people. Right. I think the purpose of that whole part of the case was going to the lack of competency on the part of the doctor  and ultimately the doctor ended up going to a hospital and was determined to have a fairly advanced stage of dementia, which had been going on for about ten years. Sir, further questions? All right. Thank you, Mr. Cleveland. All right, Mr. Crosby, you saved time. Yes, sir. What was your defense to the bankruptcy fraud? Yes, sir. The bankruptcy was that the government's very first witness, who was there to describe what the guidelines were for how to handle reimbursements and disbursements, set out some vague guidelines. And although she said you cannot pay a pre-bankruptcy creditor, if you loan money to your company, there are ways to pay it back. There are three dispersals that are at issue. So March, I mean January 2013, March 2013, and April 2013, and all those disbursements added up to right at $50,000 when you add that plus the salary. Dr. Lyons had just borrowed $50,000 from his retirement account and put it into the company so that it could survive. They could keep the employees employed. You had to pay that back within a certain period, within 90 days. So she was paying him back his salary and reimbursing him for those amounts. She was paying him back, but I thought she deposited the checks in her account. She did, and that was one of the issues that the jury sent out a note asking, do we have to find that she spent and transferred the money or how she handled it. But she did take, and that's what made it look bad, is that she was taking the money and putting it, it appeared as if she was taking it and putting it into her bank account. But she had the power of attorney and she had no reason to have to go through all this surreptitiousness to put it into bankruptcy and endanger herself to take the money. She had the right to go take the money anyway. But they were trying to, her explanation was that she— Well, I mean, she had money from Dr. Lyons at one point. She even had cash from Dr. Lyons, but they were in danger of being closed down and the bank account seized without the employees being paid. It happened one time before when the landlord came and put JB Weld on the locks of the doors and they couldn't pay the employees. And that's why they started this cashing of the checks from the doctor on down to all the employees. They started cashing them. And when Dr. Lyons was cashing the checks at the same time, it looked like she was putting them in there. And she was there with him. But she had other explanations for that, and it wasn't clear. But as far as her paying back—Dr. Lyons, of course, could give money to whoever he wanted to. The question was, was Dr. Lyons entitled to that money to be paid back? Did she testify? She did. But see, that's another thing. Was Dr. Lyons the victim or the bankruptcy the victim? Because she had a right to pay back Dr. Lyons. And did she get the right approval? Did she follow those guidelines? And so if she didn't technically follow the guidelines, again, does that rise to the level of defrauding or no felony? What did she testify regarding the ultimate destination of those funds? She didn't take all the money. She didn't, but I'm— No, we're talking about focusing on the three checks that you're talking about. What was her explanation at trial as to the destination of those funds? She did not take his money is what she testified. She testified she did not take that money. That was not his money that she deposited. She was raising other money because this investigation was ongoing. But that's why I didn't— I don't follow that. She wrote the checks. She did. And she also— And she put them in her account. Well, she wrote the checks and went with Dr. Lyons, and she cashed her own check and helped him cash his checks. Slow down just a minute. She wrote the check and put the money—she made deposits in her account, personal account. That's not how she testified. Well, that's what I'm—that's my question. What's your explanation? She testified that Dr. Lyons—she gave Dr. Lyons his money, and he did whatever he did. Some of it he paid back on his retirement account, and some of it he discounted. But she— She's paying him back? She was managing the office and reimbursing him for the $50,000 she was entitled to along with his salary. She's reimbursing him by putting it in her account. Well, that's—it's only alluded to that she was making deposits at the same time he was cashing the checks, so it looks like she did. And I wasn't trying to challenge that. I was saying for the sake of argument— Well, it looks like you did when you write a check for $10,000 and it shows up in your account at $10,000 on that day. Well, there were—she was— Money is fungible, but checks aren't. I understand. And so what I'm saying is, so was Dr. Lyons the victim? Because Dr. Lyons, if he was entitled to be reimbursed for what he put in there, she disclosed every penny of it. She put it all down on the MOU. She submitted it to the bankruptcy court-appointed forensic accountant. They all had everything on, black and white, what she was doing as far as paying Dr. Lyons back. Now, if Dr. Lyons was the victim, and that's really how the case was designed, was that Dr. Lyons made it look like Dr. Lyons was the victim, not the bankruptcy court. But yet they were able to convict her because of that. Mr. Crosby, we've taken all your rebuttal time with questions, so I'm sure you'd like to have maybe one minute to summarize or respond, and you may do that. But limit it to one minute. Yes, sir. I can say very quickly, I want to make clear that we didn't just send an e-mail about the jury instructions, that there was a very long, lengthy charge conference that we had, and it later was put on the record. The first opportunity after the trial, we put it in during the Senate scene was the first time we had, and the judge allowed me to proffer that we did, in fact, raise those issues about the jury instructions during the charge conference. But the judge took exception because he said, well, after we came out of the charge conference is when he wanted it on the record, but there was some confusion over that issue. But we did give the – there's no doubt we gave the trial judge the opportunity. With respect to the comments the prosecutor made in closing argument, it wasn't just that he's making this declaration and making himself a witness, but he also told the jury that he subpoenaed very important records and said they don't exist, which was not a correct statement. As the judge recognized that the prosecutor made a false statement regarding subpoenaing of records that would have helped prove that Dr. Lyons was, in fact, practicing medicine. But in summation, Your Honors, it is difficult to be in a position whenever I'm criticizing opposing counsel but opposing counsel did these things. He did these things and took away my client's right to be tried on the evidence and the facts presented. He started from the opening statement. I think we have your argument now. Yes, sir. Thank you, Mr. Crosby. Yes, sir. Thank you for your submission. Thank you.